LOUISVILLE AND NASHVILLE
RAILROAD COMPANY,

v.

John M. SULLIVAN, Administrator,
Federal Railroad Administration et
al., Appellants.

No. 79–1697.

United States Court of Appeals,
District of Columbia Circuit.

Jan. 8, 1980.

As Amended April 4, 1980.

See also D.C., 471 F.Supp. 469.

Ronald R. Glancz, Alice L. Mattice and Raymond K. James, Washington, D. C., were on the appellants' motion for stay pending appeal.

Dennis G. Lyons, David H. Lloyd, Mark J. Spooner, Charles H. Cochran and Andrew Butz, Washington, D. C., were on the appellees' opposition to the motion for stay pending appeal.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion PER CURIAM.

Dissenting opinion filed by Circuit Judge WILKEY.

PER CURIAM:

On February 7, 1979 the Federal Railroad Administration issued Emergency Order No. 11 which characterized the entire 10,600 miles of track of the Louisville and Nashville Railroad as a single facility and, on the basis of its "current" safety record with respect to the transportation of hazardous materials, restricted the speed of any train carrying hazardous materials to a maxi-

mum speed of 30 miles per hour and imposed other operational restrictions. The District Court, Gesell, J., held that the Emergency Order exceeded the authority of the Administrator under the statute, 45 U.S.C. § 432, and granted summary judgment for the Railroad, thereby restraining the FRA from enforcing its order. Thereafter the court refused to stay the effectiveness of the injunction pending appeal. FRA appealed and now moves for a stay pending appeal. We deny the motion.

## I. THE ISSUANCE OF EMERGENCY ORDER NO. 11

Emergency Order No. 11[1] placed certain restrictions on the movement of hazardous materials over track owned or leased by the Louisville and Nashville Railroad (hereafter L & N), a railroad with 10,600 miles of track of which about 6000 miles is main or branch lines. The order, inter alia, restricted the movement of all trains carrying any hazardous materials to a speed that did not exceed 30 miles per hour, required a particular placement of certain long and empty cars in certain consists, and doubled the required frequency of track inspections coupled with a requirement that certain track be inspected on foot.

The affidavit of the L & N's assistant Vice-President—Operations, James I. Adams, asserts that compliance with this order in the short time that it was in effect cost the L & N several millions of dollars in increased operating expenses, disrupted its entire operation, reduced its operating fuel efficiency and caused a loss of customers that may have some permanent consequences. These facts are not controverted. The Emergency Order issued on February 7, 1979 is the most far reaching and the least specific of any Emergency Order ever issued by the FRA. Every one of the previously issued 10 emergency orders related to *specific* pieces of equipment or *clearly designated sections of track* and specified the particularized defects that were complained of and specified their location.[2]

The FRA claims that Emergency Order No. 11 conforms to the statutory authority set forth in 45 U.S.C. § 432, which provides:

If through testing, inspection, investigation, or research carried out pursuant to this subchapter, the Secretary determines that any *facility* or *piece of equipment* is in unsafe *condition* and thereby creates an emergency situation involving a hazard of death or injury to persons affected by it, the Secretary may immediately issue an order, without regard to the provisions of section 431(b) of this title, *prohibiting the further use of such facility or equipment until the unsafe condition is corrected.* Subsequent to the issuance of such order, opportunity for review shall be provided in accordance with section 554 of Title 5.

1. Attachment C to Appellants' Motion for a Stay Pending Appeal.

2. Emergency Orders: No. 1, Flexi-Van Cars of the Penn Central Transportation Co.—Cracked center—still members. No. 2, XJLX Tank Cars—structural inadequacy—shell cracking and possible leakage of hazardous lading. No. 3, Cars transporting Class 4 Explosives—cars with low-sparking brake shoes. No. 4, Track between Jeffersonville, Indiana and Chicago, Illinois—419 miles—prohibited all passenger and freight service for failure to comply with track gauge, profile, constitution of ties, defective rails, ballast and other specific defects specifically identified in an appendix (3 pages). No. 5, Handling of DOT 112A and DOT 114A uninsulated tank cars, loaded with flammable compressed gas. No. 6, Illinois Central Gulf track between Crick Junction, Missouri and Clark, Missouri (130 miles) because of likelihood of "false clear" or "false proceed" signals being shown as a result of failure to cut vegetation that interferes with signal live wires. No. 7, Required removal of all freight cars with high carbon cast steel wheels because of likelihood of derailments caused by braking of these wheels due to overheating. No. 8, 35 miles of track of the New York Susquehanna and Western Ry. Overage cross ties (majority installed 1929–1932), no track inspections by railroad. No. 9, Prohibited transportation of hazardous materials over Consolidated Rail Corp. track covering 6.8 miles between Paritan Junction, New Jersey at mile post 19.7 and mile post 26.5 at Edison, New Jersey. Insufficient number of non-defective cross-ties and inadequate inspections. (Appendix attached to order). No. 10, Prohibited transportation of hazardous materials over carrails track (Black Rock Branch) between mile posts 389.7 and 399.3 (9.6 miles).

(Emphasis added). The scheme of this statute is plain. Whenever the Secretary of Transportation, who delegated his authority to the FRA, determines that an emergency situation is created by "any *facility* or *piece of equipment* [being] . . . in *unsafe condition*" he may immediately without the hearing called for by 45 U.S.C. § 431(b) "issue an order . . . prohibiting the further use of such facility or equipment until the unsafe condition is corrected."

The Order recites a number of derailments in recent years on the L & N that involved cars carrying hazardous materials. The causes of these derailments were listed as follows: broken rail—4; defective track —7; broken wheel—3; defective equipment —1; burned up journal—1; no cause—2. In a number of the accidents hazardous materials were released onto the roadbed and into the air and caused loss of life and serious injury to many individuals. The memorandum opinion that accompanied our order of February 26, 1979, discloses these consequences in greater detail.

The circumstances and the statistics cited in the order support a conclusion that the L & N had a very poor safety record in the transportation of hazardous materials. However, under the statute quoted above under which the order purports to be issued, a generalized poor safety record is not a sufficient basis for the Administrator to issue an Emergency Order of the nature and extent that was issued here. The statute requires the Administrator to show first that some particular "*facility* or *piece of equipment* is in unsafe condition and thereby creates an emergency situation involving a hazard of death or injury to persons affected by it . . . ."

The order here does not point to any particular "piece of equipment" that is unsafe. Rather it alleges that the L & N has "serious and widespread *safety deficiencies* throughout its system with respect to the transportation of hazardous materials, and that these deficiencies create a constant and substantial risk to the health and safety of the public." Emergency Order No. 11, at 8 (emphasis added). This falls short of the specific finding that the statute requires before the Administrator may "[determine] that any . . . *piece of equipment* is in unsafe condition." Also the allegations that there are "serious and widespread safety deficiencies throughout" the L & N system does not constitute a determination that "any *facility* . . . is in unsafe *condition*". In fact it completely fails to address the *condition* of the facility. The claimed "facility" that the Order apparently relies upon is the entire 10,600 miles of L & N tracks over which the railroad moves its freight trains carrying hazardous materials.

As we stated in our prior memorandum, it is our opinion that the railroad tracks may be considered to be a "facility" under the statute. *Munoz v. Porto Rico Ry., Light & Power Co.*, 74 F.2d 816, 821 (1st Cir. 1934), *cert. denied*, 296 U.S. 577, 56 S.Ct. 88, 80 L.Ed. 408 (1935). However, the widely separated derailments specified in the order and the allegation of "widespread safety deficiencies throughout its system" fall far short of supporting the determination required by the statute that the entire *facility* represented by the 10,600 miles of tracks is in "unsafe condition". In fact, 7 of the 18 accidents relied upon were not caused by track defects and it cannot be presumed that all derailments were due to deficient track.[3]

We also note that the Administrator on April 6, 1979 rescinded the Emergency Order with respect to the L & N's main line between Flomaton, Alabama and Chattahoochee, Florida (milepost 607 main line

---

3. The two most recent egregious derailments in the nation, from reports published in the newspapers were not charged to track conditions. The wreck of "The Crescent" passenger train of the Southern Railroad on December 3, 1978 was charged by the Federal Railroad Administration to exceeding the speed limit on a curve (New York Times, December 5, 1978, p. 4) and the enormous derailment of 80 freight cars carrying soda ash on the Union Pacific on July 31, 1979 was reported by the railroad and the National Transportation Safety Board to have been caused by a "clog in the brake line of the sixth car from the front of the train." (Denver Post, August 21, 1979, p. 26).

connected to milepost 811, end of Louisville and Nashville owned). This followed a thorough inspection by FRA safety inspectors. (FRA Emergency Order No. 11—Notice 5). Also on June 8, 1979 the Emergency Order was amended by a "Partial Removal of Order" as to several identified segments of L & N trackages as follows:

> [M]ain line between Nashville, Tennessee and Birmingham, Alabama, between mile posts 197 and 386; Birmingham to Montgomery between mile posts 397 to 485; Corbin, Kentucky-Cartersville, George (milepost 176 to milepost 423); Nashville, Tennessee-Memphis, Tennessee (milepost 0 to milepost F–370); Nashville, Tennessee-Chattanooga, Tennessee (milepost 7 to milepost 132); Montgomery, Alabama-New Orleans, Louisiana (milepost 485 to milepost 800.4); and Birmingham, Alabama (milepost 386 to milepost 397).

Emergency Order No. 11—Notice 7, at 3–4.

## II. THE DISTRICT COURT ORDER OF JUNE 18, 1979

On June 18, 1979 the Honorable Gerhard A. Gesell, United States District Judge, granted the motion of the Louisville and Nashville Railroad for summary judgment and issued a memorandum opinion in connection therewith which stated *inter alia* as follows:

> In sum, the Court concludes that the February 7 Order, [Emergency Order No. 11] on its face and as administered, violates the requirement of Section 432 that the Order relate solely to a "facility or piece of equipment" being "in unsafe condition," the further requirement of Section 432 that the Order prohibit "the further use of [a] facility or equipment until the unsafe condition is corrected," and the dictates of the Fifth Amendment.
>
> An emergency situation may well still exist. It should, however, be dealt with in far more concrete and specific terms. The Order exceeds the authority granted the Administrator under Section 432 and is hereby declared to be illegal. Nothing herein prohibits the immediate issuance

of a properly drawn order, directed to any persisting emergency.[4]

This conclusion of the District Court conforms substantially with our own analysis of the statute and its application to Emergency Order No. 11.

Section 432 requires a more particularized designation of the particular *facility* or *piece* of equipment that the Administrator has determined is in unsafe condition. The statute that permits the Administrator to issue prohibitory orders without any hearing is not an open sesame for the Administrator to take over the operation of an entire railroad unless he is able to support a determination that substantially all the track of the railroad is in *"unsafe condition."* The statute does not permit the Administrator to make a broad brush generalized allegation of *unsafe condition* of all the railroad's track that is unsupported by any specific factual demonstration and then proceed to hold the operation of all trains hostage to compel compliance with other demands of the FRA that are unrelated to the condition of any "facility or piece of equipment."

At oral argument in the District Court counsel for the Administrator admitted facts that prove the Emergency Order went beyond the "track" to which § 432 authorized it to apply:

> We inspect the track. Our indications have been each time we have inspected that portion which they say is adequate, it isn't.
>
> Then we go back to them and say, Conform that section of the track to the regulations, which have always existed and which nobody disputes exist, as far as how many nails or whatever else you use to hold down the tracks, *and the esoteric things* that I am not familiar with, nor Plaintiff's counsel, nor the Court is familiar with.
>
> Once they have complied with that, you then get into the harder question of whether you are going to put a segment of track back into effect because it deals

---

4. *Louisville & Nashville Railroad Co. v. Sullivan*, 471 F.Supp. 469, 473 (D.D.C.1979).

with *issues which are above that particular section of track.*

They go towards the extremely poor training that members of the L&N firm, the engineers, have. They deal with the poor maintenance that is routinely performed on the track, once brought up to standards, and deal with failure to discipline people for violating safety regulations.

What Plaintiff has categorized as a middle-management syndrome, I think that is a pretty gross generalization, but I think they deal with the fact that L&N has not taken action in the training program, in the maintenance program, in the disciplining program, and so forth, to stop the problems.

*Now assuming a section of track were perfect, or whatever the standards require, we still have the over-all problem of the railroad, itself, getting up to snuff. That factor is a less objective factor. .*

Tr. June 5, 1979, at 33–34 (emphasis added).

Counsel thus contended that the Administrator had authority to issue the Order affecting the entire railroad and then under threat of not removing it, he could impose conditions such as a "training program, . . . maintenance program, . . . disciplin[ary] program, and so forth" that would permit the Federal Railroad Administration to take over other aspects of the operation of the railroad. *Id.* at 34.

FRA counsel further argued that the Court could not reach the issue of the basic validity of the Emergency Order under the statute unless the plaintiff "exhausted its remedies because you should give the Administrator [the] first bite at th[e] apple". *Id.* at 38. It would seem, however, that he had his first bite when he issued the Order. It was also admitted by FRA's counsel that he could not "point out the particular paragraph" in the Emergency Order indicating where the tracks are defective. *Id.* at 47. The Administrator contended that he should not be tied solely to the Emergency Order in sustaining it because the Order was "not really the whole picture." *Id.* at

49. He contended that to the degree that the Order did not include "the whole picture" the railroad could then come to the Administrator and ask them for relief. "It is a mutuality of us giving them some indication of the problems . . . and being able in some situations to work out some solutions." *Id.*

The response of the Court to the Administrator's attempt to defend the Emergency Order on such a loose basis was significant. He clearly pointed out:

[I]t depends on whether we have a government of law or a government of men. That is what you are talking about. We are responsible people and we will work it out if we think they are responsible.

That is no standard in a courtroom. *Id.* It is likewise no standard for compliance with the statute. Congress did not in Section 432 invest the Administrator with authority to effectively take over the operation of a railroad by the issuance of a broad open-ended (admittedly incomplete) Emergency Order. The statute refers to railroad *facilities and pieces of equipment* and this requires some particularization as to what particular *facility* is in an "unsafe condition" or what particular "piece of equipment" is in unsafe condition.

It is apparent from the language of Section 432 that Congress did not intend to authorize the Administrator to restrict the operation of L & N freight trains over thousands of miles of track under the claim that the tracks are in unsafe condition when the real complaint of the Administrator is that he considers that the engineers who handle the trains should be trained differently in some unspecified manner.

The National Transportation Safety Board (hereafter the Safety Board) in its formal report reviewing hazardous materials rail shipments and the operations of the Federal Railroad Administration (see Appendix) found the same defect in the FRA's administration of the Act when it directed the Administrator to "immediately revise the track safety standards to eliminate the *subjectivity*, incompatibility, vagueness, and

unenforceability" that its review of the FRA disclosed. Safety Board Report at 34. It ordered that the FRA "requirements should be made more explicit so as to insure the detection and correction of all combinations of track conditions which cause derailments." *Id.* The L & N is similarly entitled under § 432 to "more explicit" findings that are within the authority of the FRA over facilities and equipment, and that are limited to *facilities* and *equipment.*

In a slightly different vein we likewise find that the FRA should be less subjective and more explicit. This should not be difficult. The Administrator asserts that over the last 3 years the FRA has made extensive inspections of the L & N freight operations and its track. It asserts that during the first 6 months of 1978 alone 91 track inspections covering 854 miles of L & N track were conducted by FRA track inspectors. These inspections allegedly disclosed 1,288 instances of non-compliance with FRA track standards. It also appears that the FRA used track geometry cars to inspect railroad trackage and as a result of the use of such equipment in 1978 45 miles of track were found to be in non-compliance with the requirements imposed by the track standards for the posted track class and 17 of these miles were found to be below minimal requirements for class I track.[5]

With the FRA having such great familiarity with the trackage of the L & N system and having the track geometry cars available to readily check the tracks, it is not too much to direct the FRA, as did the Safety Board, to be "more explicit" and particularize its complaint rather than issue a broad brush order of the character of Emergency Order No. 11. If the FRA finds the railroad to be deficient in matters other than its *facilities* and *equipment,* the L & N railroad admits that

> wholly aside from his emergency powers, the Federal Railroad Safety Act grants the Administrator a full and adequate

remedy for violation of any of his safety regulations in a *judicial* forum. He not only can sue for civil penalties under Section 209 of the Act (45 U.S.C. 438) but can also request injunctions, *including TROs and preliminary injunctions where appropriate,* under Sections 208 and 210 (*as amended,* 45 U.S.C. §§ 437, 439), for any violation of his rules and regulations.

Appellee's Memorandum in Opposition to Motion for Stay Pending Appeal, at 32. The Administrator clearly exceeds his authority when he attempts to use an Emergency Order under Section 432 as a means of exercising general regulatory authority over the "train operations and training programs" of the L & N. Emergency Order No. 11, Notice 8, at 2.

Judge Gesell's opinion points out that the Administrator's order is deficient in failing to notify the railroad of what specific steps it must take in order to satisfy the standards that the Administrator was imposing. The lack of specificity in the order made this criticism apparent. The Administrator attempted to counter this criticism by its Emergency Order No. 11, Notice 8 issued on June 27, 1979. This Order interpreted the decision of the District Court as pointing to a failure of the Emergency Order to specify the standards under which relief from the Order could be obtained. The FRA agreed that a need existed to state the procedures employed in evaluating requests for relief and then proceeded to amend the Order to provide that the following factor, among others, would be considered in determining whether, after field inspections, the restrictions would be removed: whether the relevant pieces of equipment were found to be in substantial compliance with—

> Track Safety Standards (49 CFR Part 213) setting forth maintenance and repair programs . . . Freight Car Safety Standards (49 CFR Part 215) and Power Brake Regulations (49 CFR Part 232) . . . the Locomotive Inspection Act

---

5. Emergency Order No. 11, at 12–13.

The track standards recognize six track classes (the highest being Class 6, over which maximum operating speed for freight trains

is 110 miles per hour), and prescribe progressively more stringent safety requirements for each such class (49 CFR § 213).
*Id.* at 13 n.3.

(45 U.S.C. §§ 22–34) and implementing regulations (49 CFR Part 230) . . . insofar as those standards bear on the immediate danger of train collision or derailment.

Emergency Order No. 11, Notice 8, at 2. The District Court found these to be wholly inadequate specifications and particularizations. We agree. It is akin to an indictment only stating that John Jones is accused of violation of 18 U.S.C. § 2113.

The June 27, 1979 amendment of the Emergency Order also stated that it would consider another factor in determining whether the emergency condition continues to exist:

d. Whether, based on field investigations, including interviews with employees and observation of train operations and training programs, those L&N personnel responsible for the use of equipment and facilities in rail transportation are informed of, and substantially comply with, operating rules and procedures adopted by the railroad or prescribed by Federal regulation which are essential to the safe operation of trains and the safe handling of hazardous materials cars in train. See 49 CFR parts 174, 217, 218.

Emergency Order No. 11, Notice 8, at 2–3.

It is obvious that these provisions exceed the authority vested in the Administrator under Section 432 to issue an Emergency Order with respect to *facilities* and pieces of *equipment* alleged to be in unsafe condition. The matters referred to in section d are clearly the type of supervision on which the railroad is entitled to a hearing and the Administrator should proceed in the Courts in the manner indicated above.

### III. THE LAW APPLICABLE TO A STAY PENDING APPEAL

In considering whether a stay should be entered pending appeal we are guided by the same standards that control the issuance of a preliminary injunction. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App. D.C. 220, 559 F.2d 841 (D.C. Cir. 1977); *Virginia Petroleum Jobbers Ass'n. v. F. P. C.*, 104 U.S.App.D.C. 106, 259 F.2d 921 (D.C.

Cir. 1958). Applying these standards we have concluded that the FRA's likelihood of succeeding on the merits is extremely remote, that the L & N will be irreparably injured if the Emergency Order is not enjoined, that other parties will not be substantially harmed by the injunction against the present Order because if there are valid grounds to issue an Emergency Order the FRA may immediately proceed to do so in a proper manner and may reach other operational deficiencies by prevailing in court, and that the public interest will be best promoted by confining the jurisdiction of the FRA to the authority conferred on it by the statute enacted by Congress. We therefore find that the conditions exist upon which to deny a stay pending appeal. In reaching this conclusion we rely upon the reasons set forth in the extensive memorandum of the District Court, and the additional reasons set forth above. Therefore we deny the motion for stay pending appeal.

We are not unmindful of the large number of very serious accidents on the railroads of the United States involving hazardous materials. As the Report of the Safety Board indicates such accidents occur throughout the nation. It is a matter which affects a great many railroads and the statistics indicate that the L & N is not alone in experiencing a large number of derailments with very serious consequences. The L & N had one derailment with such severe consequences that it brought its statistics into the top range of the Class I railroads, but as the Safety Board Report indicates, "enforcement of track safety standards has not always prevented track-caused derailments." Safety Board Report at 33. Since the enforcement of track safety standards cannot be depended upon to prevent track-caused derailments, the problem is indeed complex. In addition to track-caused derailments there are also the derailments caused by equipment failures. These cannot always be attributed to the host railroad, as much of the hazardous material is transported in cars of foreign railroads and in tank cars owned by the shippers. The statistics relied upon in the

Emergency Order where derailments were caused by defective equipment did not indicate what railroad or shipper owned the equipment. Thus it may be unfair to hold the L & N to be responsible for the derailments caused by some equipment failures.

The problem is very serious and as to whether the improvements in the administration of the Federal Railroad Act that are suggested by the Safety Board Report (see Appendix) will correct the problem we express no opinion. However, if the Administrator determines that particularized sections of track (facility) or designated equipment create a hazard to justify an Emergency Order he should issue an Order specifying the particular track or equipment in question. And if he has grounds to support a determination that the lack of skills of operating or supporting personnel of the railroad also create a hazard to persons or property he can attack that problem direct-ly in the courts—as the L & N admits, *supra*. But the railroad will then normally be entitled to a hearing before an injunction is issued. Our denial of the motion for stay is without prejudice to the right of the Administrator of the Federal Railroad Administration to proceed by either avenue or both if he has justifiable grounds. In this respect we repeat the following portion of the District Court's Memorandum:

> An emergency situation may well still exist. It should, however, be dealt with in far more concrete and specific terms. The Order exceeds the authority granted the Administrator under Section 432 and is hereby declared to be illegal. Nothing herein prohibits the immediate issuance of a properly drawn order, directed to any persisting emergency.

*Louisville & Nashville Railroad Co. v. Sullivan, supra* note 4, at 473.[6]

*So ordered.*

---

**6.** The dissent contends that the "burden of inspecting . . . the main and branch line track should not be placed on the federal inspectors." But that is their statutory duty. They have highly specialized equipment to do it expeditiously and the FRA indicates it has carried out this duty recently and over the past three years. If the FRA has done its job they are in a position to specify the areas of track that they contend fall below standard and require repair or reduced speed over those rails. The FRA had the specific information and the sections of track it covered but refused to specify same in its order, choosing instead to assert power that was not conferred on it to restrict operations on the tract that met specifications so they could enforce some undisclosed management decisions. This is a gross misuse of statutory power. It is the expansion of the limited power to deal with specific physical conditions into the unlimited power to run the railroad. The statute places the burden on the FRA to specify the facility and equipment and it is far beyond reason to suggest that the FRA can designate all *rails* (when the FRA knows that all rails are *not* below standard) and then require the railroad to prove that every mile of track meets the standards. Such extravagant authority would permit the FRA to declare that all cars on the railroad are a hazard and then refuse to let the railroad operate until all cars were proved to be up to standard—all the time having data that indicates that only a very few cars might not be up to standard.

The "big problem" the dissent refers to that may be the subject of an emergency order, is nothing more than a series of little problems relating to a facility or piece of equipment. In accordance with all prior practices of the agency these little problems should be specifically designated as to the location and alleged defect so as to avoid their expeditious correction being made into a game of blind man's bluff. One would think, even if due process did not require it, that specific designation of the location of the alleged defects constituting the "big problem" would be the method that would ensure their earliest correction.

It is also rather obvious that the dissent is not familiar with the breadth of its suggestion that all the railroad has to do is comply with *all* the safety standards. My colleague just seems to have no comprehension of the magnitude and impossibility of the burden that would be imposed if the FRA order lacked practically all specificity. It would be similar to saying an accused must prove that he has not violated the conspiracy statute. The burden of specificity is placed on the FRA because that is where the statute places it.

In closing it should be noted that the dissent nowhere attempts to answer for the defects of the FRA that are relevant to this case and are set forth briefly in the Appendix; and nowhere defends the delay of the FRA for refusing to remove vast sections of main line trackage from the reduced operating restrictions.

The FRA is a statutory body and it should exercise authority with respect to emergency orders as it has *always* done in the past (Emergency Orders 1–10) by specifically designating the segment of track or the piece of equipment that is not up to safety standards. That is what the FRA inspectors are hired for.

## APPENDIX

*The Report of the National Transportation Safety Board*

"In June 1978, Conferees of the House and Senate directed the National Transportation Safety Board '. . . to conduct a thorough review of hazardous materials rail shipments and the applicable Federal rail standards as well as determine how the Federal Railroad Administration can more effectively prevent the occurrence and reduce the severity of derailments of hazardous materials.[1]

The Independent Safety Board Act of 1974[2] authorizes the National Transportation Safety Board to ". . . evaluate, assess the effectiveness, and publish the findings of the Board with respect to the transportation safety consciousness and efficacy in preventing accidents of other Government Agencies [and] . . . to evaluate the adequacy of safeguards and procedures concerning the transportation of hazardous materials and the performance of other Government agencies charged with assuring the safe transportation of such materials."[3]

Pursuant to the June 1978 direction by the Congressional Conferees and the powers conferred by its governing statute the National Transportation Safety Board (hereinafter the Safety Board) undertook a comprehensive review of the problems surrounding the transportation of hazardous materials and how the Federal Railroad Administration [hereinafter also FRA] could exercise its direct authority in the field to more effectively prevent the occurrence and

reduce the severity of derailments of hazardous materials.[4]

This Congressionally directed investigation implicitly indicated some criticism of the manner in which the problem was being handled by the Federal Railroad Administration or with the statutory authority that the FRA possessed. The Safety Board made an extensive review of the problem[5] and on March 8, 1979 issued its Report, *supra*,[6] to the public. The formal report covers 53 pages.

Because the transportation of hazardous materials by all railroads, not just the Louisville and Nashville, is a matter of nationwide concern, and because the current Report on that subject by the National Transportation Safety Board sets forth a number of the relevant facts on the problem, we refer to a few of its findings, conclusions and recommendations. Doing so permits us to view the situation on the Louisville and Nashville Railroad in perspective with that of other American railroads and with respect to the governmental activities in this area of railroad regulation.

Without going completely into the numerous features in which the Report faults the Federal Railroad Administration we note the report found that the number of derailments consists of transporting hazardous materials had been increasing for *all railroads* in recent years. From 1971 to 1977 the number of reported instances involving release of hazardous materials on railroads had increased from 346 in 1971 to 1,500 in 1977.[7] The Report also showed that the number of such accidents had in-

---

1. U. S. House of Representatives, "Making Appropriations for the Department of Transportation and Related Agencies," Report No. 95–1329, June 29, 1978." Report No. SEE–79–2, Safety Effectiveness Evaluation of the Federal Railroad Administration's Hazardous Materials and Track Safety Programs." March 8, 1979, page iii.

2. Independent Safety Board Act of 1974, P.L. 93–633, January 3, 1975, 49 U.S.C. 1901 et seq., 81 Stat. 2166, et seq.

3. *Id.*

4. 124 Cong.Rec. H6291, 6292.

5. *Id.*

6. Report No. SEE–79–2, National Transportation Safety Board, Safety Effectiveness Evaluation of the Federal Railroad's Administration's Hazardous Materials and Trade Safety Programs, March 8, 1979.

7. "1971 1972 1973 1974 1975 1976 1977
  346  337  412  617  679  959  1500"
  *Id.*, Table 3

creased from 80 in 1971 to 186 in 1975 [8] and that while the number of consists in derailment had only modestly increased from 1975 to 1977 that the Railroad equipment damage had increased from $18 million to $29 million.[9]

The Report of the Safety Board concluded that for the Federal Railroad Agency to improve its effort in the safe transportation of hazardous materials would—

"require a strong, knowledgeable railroad safety professional at the head of the Office of Safety . . . The absence of a full time, railroad safety expert at the controls of the Office of Safety has had a remarkable effect upon the success of the FRA Safety program . . . the absence of a respected leader . . . has resulted in a loss of confidence in the ability of FRA to develop, implement, and administer an effective safety program . . . there is widespread disenchantment with the FRA Safety performance . . . the Safety Board believes that the absence of a strong safety management leader is reflected in the unstructured, reactive program . . .[10]

8. Summary of Railroad Hazardous Materials Accidents Showing Casualties and Evacuating

1971–1975

| Year | No. of Accidents | Deaths | Injuries | Evacuations | No. of Persons Evacuated |
|---|---|---|---|---|---|
| 1971 | 80 | 1 | 57 | 16 | 3,005 |
| 1972 | 99 | 0 | 226 | 18 | 5,274 |
| 1973 | 123 | 2 | 384 | 32 | 29,647 |
| 1974 | 148 | 10 | 613 | 28 | 10,941 |
| 1975 | 186 | 0 | 20 | 19 | 4,755 |
| TOTAL | 636 | 13 | 1,300 | 113 | 53,622 |

*Id.*, Table 1

9. Derailments Involving Consists Transporting Hazardous Materials

1975–1977

| | No. of Consists In Derailments | Total No. of Cars In Consists | No. of Cars Containing Haz. Mat. | Haz. Mat. Cars Damaged | Haz. Mat. Cars Releasing | People Evacuated | Railroad Equipment Damage ($) |
|---|---|---|---|---|---|---|---|
| 1975 | 637 | 48,669 | 4,711 | 891 | 126 | 3,345 | 18,128,364 |
| 1976 | 627 | 45,363 | 2,642 | 736 | 152 | 13,679 | 22,894,291 |
| 1977 | 673 | 50,007 | 3,118 | 949 | 153 | 10,696 | 29,670,284 |
| TOTAL | 1,937 | 144,039 | 10,481 | 2,576 | 421 | 27,720 | 70,692,939 |

*Id.*, Table 2

10. A difficulty associated with this review is that the Congressional directive contemplates looking at the weaknesses, which may result in some persons' forgetting the many strengths of the organizations that are responsible for the relatively good railroad safety record. This review probed problems and the report is directed at delineating them and recommending solutions. The Safety Board was impressed with the talent and professionalism of FRA's staff and these strengths must be the foundation for improvements. To improve their effort will require a strong, knowledgeable railroad safety professional at the head of the Office of Safety who has the authority, as well as the responsibility, to issue clear-cut management directives, and to develop, implement, and administer a safety program in a disciplined manner.

The absence of a full-time railroad safety expert at the controls of the Office of Safety has had a remarkable effect upon the success of the FRA safety program. In spite of the dedication of the staff, the absence of a knowledgeable leader who is respected by the staff, the Secretary, the Administrator, the railroads, and labor has resulted in a loss of confidence in the ability of FRA to develop, implement, and administer an effective safety program. Labor

The Safety Board also concluded specifically that "FRA's hazardous materials safety program is fragmented and reactive without established goals, objectives, or criteria by which success can be determined" and reached other significant conclusions.[11] There are many other comments on the conduct of the hazardous materials safety program by the Federal Railroad Agency, but those referred to above give a general idea of the Safety Board's conclusions as set forth in its formal Report.[12]

The Safety Board Report also included the following Recommendations that significantly touch upon various aspects of the FRA and the railroads that are relevant to the issues raised by FRA's Emergency Order No. 11 and the L & N:

Select and install a railroad safety expert as Associate Administrator for Safety. Assure that he has the authority commensurate with his responsibility for the railroad safety program. (Class I, Urgent Action) (R–79–14)

Develop a data base that will allow the definition and rating of railroad safety problems, particularly those problems re-

lated to the derailment of hazardous materials. (Class II, Priority Action) (R–79–16)

Develop and document a track safety program based on risk as indicated by a comprehensive safety analysis which will include: desired level of safety (risk) to be achieved; program goals and objectives based on that level; and criteria by which the success of the program will be measured. (Class II, Priority Action) (R–79–17)

Immediately revise the track safety standards to eliminate the subjectivity, incompatibility, vagueness, and unenforceability. The requirements should be made more explicit so as to insure the detection and correction of all combinations of track conditions which cause derailments. (Class I, Urgent Action) (R–79–19)

Safety Board Report at 34. These recommendations and some of the prior conclusions indicate that the Safety Board considered that the Federal Railroad Administration did not have a sufficiently compe-

---

no longer goes to FRA for action in railroad safety but instead, lobbies for legislation to accomplish their specific safety objectives. Although railroad interviewees were reluctant to indict FRA's safety activities, there is a widespread disenchantment with the FRA safety performance. Interviewees from both groups had no doubt that the continuing absence of a full time Association Administrator for Safety had affected the safety program adversely, and were convinced that a head of the Office of Safety which has the respect of all "safety shareholders" is needed if the improvements are going to be accomplished.

The Safety Board believes that the absence of a strong safety management leader is reflected in the unstructured, reactive program. A safety program which sets as a goal the doubling of last year's fines without knowing the effect of fines on the reduction of accidents reflects a lack of understanding of what controls risks. Goals and objectives must be the result of scientific safety analyses and they must be measurable, attainable, and worthy of support. These goals and objectives must guide program direction during times that the agency must react to crises. The agency must determine the acceptable level of safety (risk) and criteria by which the effectiveness of the program can be measured.
*Id.* at 31–32.

**11.** 1. FRA's hazardous materials safety program is fragmented and reactive without established goals, objectives, or criteria by which success can be determined. The absence of established, documented goals and objectives results in failure to maintain program direction during reactions to catastrophes.

2. FRA and MTB [The Department of Transportation Materials Transport Board] must formalize the process of finding unacceptable risks in hazardous materials railroad transportation and must act promptly once such a finding has been made.

3. The value of the results of the TSC work on hazard analysis and priority determination is jeopardized by the inadequacy of the FRA and MTB data which are being used.

12. FRA's organizational structure is not conducive to the effective management of the field inspection operation.

13. The FRA has not implemented an effective State Participation Program.
*Id.* at 32–33.

**12.** *Id.* at n.5. The Report should be read in its entirety to gather its full significance.

tent "railroad safety expert", did not have a sufficient "data base particularly relating to the derailment of hazardous materials to define and rate the railroad safety problems, that its track safety program was not based on risks grounded in a comprehensive safety analysis", and that the FRA's "track safety standards" were based upon an undesirable amount of "subjectivity, incompatibility, vagueness, and unenforceability" which should be "eliminated." [13]

WILKEY, Circuit Judge, dissenting:

Permeating the entire opinion of my two colleagues and the memorandum of the trial court below is the strange assumption that the emergency powers of the Federal Railroad Administrator under 45 U.S.C. § 432 are limited to *little problems*, that if what confronts us is a *big problem*, then somehow the Administrator has no authority to deal with it on an emergency basis. He must either isolate and segmentize the problem,[1] or conduct time-consuming hearings under the usual nonemergency procedure, or go into a federal court for the usual time-consuming judicial hearing to get an order appropriate to deal with the situation. One thing he cannot do, according to my colleagues and the trial judge, is deal with the whole problem on the basis of an emergency order.

It may very well be that when Congress enacted section 432 granting the FRA emergency powers it did not contemplate that one entire railroad track system would be in the sad shape that the Louisville & Nashville Railroad Co. obviously is in today—indeed, that a major part of the railroad trackage of the entire United States is in

today. But that does not alter the fact that if "any facility . . . is in unsafe condition and thereby creates an emergency situation involving a hazard of death or injury to persons affected by it, the Secretary may immediately issue an order, without regard to the provisions of section 431(b) of this title, prohibiting the further use of such facility . . . until the unsafe condition is corrected," 45 U.S.C. § 432. The statute puts no limit on the size of the facility, or the cost to correct the existing "hazard of death or injury."

My colleagues freely admit, "[I]t is our opinion that the railroad tracks may be considered to be a 'facility' under the statute."[2] If railroad tracks are a "facility," then there is no limit, minimum or maximum, as to how many miles of railroad track constitute a "facility" subject to being dealt with by the Administrator under his emergency powers of section 432.

The responsible expert agency, the Federal Railroad Administration, has asserted that the L & N Railroad has the "worst safety record in the nation with respect to the transportation by rail of hazardous materials."[3] My colleagues pointed out in their previous memorandum in this case that "[w]ith the one accident involving 16 deaths in 1978 and another involving 3 deaths in 1977 the L & N is 1st in those periods, as to loss of life . . . ."[4] Further, the L & N is also first in the number of railroad cars damaged in the first six months of 1978. In number of accidents, the number of cars involved, and the number of cars releasing hazardous materials, it stands high among the worst offenders.

13. *Id.* at 34.

1. My colleagues say: "However, if the Administrator determines that particularized sections of track (facility) or designated equipment create a hazard to justify an Emergency Order he should issue an Order specifying the particular track or equipment in question." Majority opinion, 199 U.S.App.D.C. at ——, 617 F.2d at 800. On the basis of this as I see the record, the L & N main line and branches of about 6,000 miles could be divided up into sections, and a separate order for each of the sections, of the same tenor as for the whole system, issued. There is no practical purpose

to doing piecemeal what the FRA has already done for the entire system, particularly since as I discuss later, the Administrator is following the procedure of lifting the restrictions on each section of the track as inspection shows it to be safe.

2. *Id.* at ——, 617 F.2d at 795.

3. FRA Emergency Order No. 11, at 8–9 (7 Feb. 1979).

4. *Louisville & Nashville R. R. v. Sullivan*, No. 79–1171, mem. op. at 7 (D.C.Cir. 26 Feb. 1979).

These accidents have occurred over various portions of the L & N tracks, they have been sufficiently numerous, sufficiently scattered, and sufficiently hazardous to raise a question about the six thousand miles of the main lines and branches of the L & N system. There would seem to be an adequate factual foundation to justify the Department of Transportation's concern over the L & N tracks and carriage of hazardous materials and for the invocation of the emergency powers of section 432. I therefore disagree with my colleagues' statement, "[T]he allegations that there are 'serious and widespread safety deficiencies throughout' the L & N system does not constitute a determination that 'any facility . . . is in unsafe condition.'"[5] The FRA's allegation as to "widespread safety deficiencies throughout" *does* constitute a determination that "any facility . . . is in unsafe condition," because the evidence—the statistics of accidents, their location, character, and frequency—shows that the *entire track facility* is in an unsafe condition.

The remedy invoked by the FRA order is specifically directed to the unsafe track condition. "The order, *inter alia*, restricted the movement of all trains carrying any hazardous materials to a *speed that did not exceed 30 miles per hour*, required a particular placement of certain long and empty cars in certain consists, and *doubled* the required frequency of *track inspections* coupled with a requirement that certain *track be inspected on foot*."[6] I submit that this is a remedy designed for the hazardous deficiencies found by the Administrator to exist in the L & N track system.

Of course, not every mile of the six thousand is defective, but it only takes one stretch of defective track to cause a derailment. If these stretches of defective track are numerous and scattered throughout the system, then the only way to correct the condition is meticulously to go over the entire system and only remove the safety restrictions where the track after inspection can be certified safe. This is exactly the procedure the Administrator is following after his emergency order. On 6 April and 8 June the emergency order's safety requirements were rescinded with regard to various sections of track.[7]

If the Administrator had been confronted with a few routine safety violations or a limited number of accidents in a limited area, then a court might very well place the burden of showing detailed defects in the track system on the FRA, as well as confine the restrictions to limited, defined sections. But here it is unquestioned that eleven of the eighteen serious accidents involving hazardous materials, all with substantial loss of property and some lives, were caused by track defects, and track defects not localized in any particular part of the system. While, as my colleagues recount, "during the first 6 months of 1978 alone 91 track inspections covering 854 miles of L & N track were conducted by FRA track inspectors," these inspections "allegedly disclosed 1,288 instances of noncompliance with FRA track standards,"[8] on the evidence before us of the L & N safety record over the entire system the burden of inspecting more than 6,000 miles of main and branchline track should not be placed on the federal safety inspectors. I submit that in this situation the burden properly shifts to the L & N Railroad to come forward and show that inspections of portions of the track have been made and that these portions are safe, and then to ask the Administrator to rescind his emergency safety order with regard to those designated portions. This is the procedure the Administrator is now following, and of which my colleagues disapprove.

I cannot agree with my colleagues' support of the trial judge's directing the FRA "to be 'more explicit' and particularize its

---

5. Majority op. 199 U.S.App.D.C. at ——, 617 F.2d 793 at 795 (emphasis deleted).

6. *Id.* 199 U.S.App.D.C. at ——, 617 F.2d 793 at 794 (emphasis added).

7. *See id.* 199 U.S.App.D.C. at —— – ——, 617 F.2d 793 at 795–796.

8. *Id.* 199 U.S.App.D.C. at ——, 617 F.2d at 798.

complaint rather than issue a broad brush order of the character of Emergency Order No. 11."[9] Nor can I agree that "the Administrator's order is deficient in failing to notify the railroad what specific steps it must take in order to satisfy the standards that the Administrator was imposing."[10]

The Administrator issued a "broad brush order" because he was confronted with a *broad brush problem, i. e.,* the breakdown of safe track conditions scattered all over the L & N system. As for notifying the railroad what specific steps it should take, the FRA pointed to its specific standards issued in regard to track safety, freight car safety, power brakes, and locomotive inspections, and said in effect to the L & N, "Comply with these duly promulgated safety standards." "The District Court found these to be wholly inadequate specifications and particularizations,"[11] and my colleagues agree. But, if these are the regularly promulgated safety standards, what is wrong with the FRA referring to them, insisting on the L & N complying, and specifying that if the L & N complies, then the railroad will be in conformity with the safety standards and the restrictions can be lifted? Why must the FRA now spell out *specific steps* to be taken to comply with duly issued safety regulations? The determination of the specific steps to be taken to comply with regulations is the responsibility of the railroad, the regulated entity. It is not the obligation of the Government agency to lead the railroad by the hand.

Leading the railroad by the hand is just about what the FRA has been doing for the past few months, but apparently not too successfully. As my colleagues cite the oral argument in the district court, counsel for the Administrator stated:

> We inspect the track. Our indications have been each time we have inspected that portion which they say is adequate, it isn't.

Then we go back to them and say, [c]onform that section of the track to the regulations, which have always existed and which nobody disputes exist, as far as how many nails or whatever else you use to hold down the tracks . . . .[12]

In other words, the Administrator's personnel have been pointing the railroad to the duly authorized safety standards, saying, "Comply with these, establish that the track is safe, and we will lift the safety restrictions imposed by the emergency order." That is just exactly the approach that the Administrator should be taking in this overall emergency situation.

These issues have been before this same panel of three judges before. On 26 February 1979 my two colleagues, over my dissent, entered an order staying the effectiveness of the Administrator's emergency safety order. On 4 April 1979 the full court of nine judges vacated my two colleagues' stay of the 26 February order, with only my two colleagues dissenting, thus restoring the effectiveness of the Administrator's emergency safety order. Strangely enough, the district court cited and relied on the decision of my two colleagues, which had been vacated, without considering the reasons stated in my dissent which caused the *en banc* court to set aside the 2–1 panel action. One would think that the district court would have realized that a 2–1 panel decision, vacated by a 7–2 *en banc* vote, was the proverbial "slender reed" on which to rely. My two colleagues, encouraged by the district court's decision, although on a different record, have gone back to their first and discredited line of reasoning on this second opportunity.

The dangerous condition with which the Administrator is trying to deal is undeniably persistent and widespread. There is absolutely nothing in the statute or practical common sense that requires the Administrator to deal with it piecemeal, by seg-

9. *Id.* 199 of —— U.S.App.D.C. at 798 of 617 F.2d.

10. *Id.* 199 U.S.App.D.C. at ——, 617 F.2d at 798.

11. *Id.* ——, at 799.

12. *Id.* 199 U.S.App.D.C. at ——, 617 F.2d at 796.

ments of the track "facility," or by any method other than the manner in which he has dealt with it as a large-scale emergency under section 432. I would stay the order of the district court enjoining the effectiveness of the Administrator's safety order.